UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

AMANDA E.,[1]                          )
                                       )
                    Plaintiff,         )
                                       )
            v.                         )          No. 2:21-cv-00090-MG-JPH
                                       )
KILOLO KIJAKAZI, Acting Commissioner of )
Social Security,[2]                    )
                                       )
                    Defendant.         )

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Plaintiff Amanda E. applied for disability insurance benefits from the Social Security

Administration ("SSA") on August 27, 2019, alleging an onset date of August 22, 2019.  [Filing

No. 15-2 at 18.]  Her application was initially denied on December 20, 2019, [Filing No. 15-4 at

4], and upon reconsideration on February 27, 2020, [Filing No. 15-4 at 14].  Administrative Law

Judge Michael Scurry (the "ALJ") conducted a hearing on August 27, 2020.  [Filing No. 15-2 at

38-61.]  The ALJ issued a decision on September 15, 2020, concluding that Amanda E. was not

entitled benefits.  [Filing No. 15-2 at 15-29.]  The Appeals Council denied review on December

10, 2020.  [Filing No. 15-2 at 2.]  On February 12, 2021, Amanda E. timely filed this civil action

asking the Court to review the denial of benefits according to 42 U.S.C. § 405(g).  [Filing No. 1.]

---

[1] On July 9, 2021, Kilolo Kijakazi automatically became the Defendant in this case when she was
named as the Acting Commissioner of the SSA.

[2] To protect the privacy interests of claimants for Social Security benefits, and consistent with the
recommendation of the Court Administration and Case Management Committee of the
Administrative Office of the United States Courts, the Southern District of Indiana has opted to
use only the first names and last initials of non-governmental parties in its Social Security judicial
review opinions.

1

# I.
## STANDARD OF REVIEW

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019).  Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision.  *Stephens*, 888 F.3d at 327.  "[S]ubstantial evidence" is "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'"  *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154).  "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled."  *Stephens*, 888 F.3d at 327.  Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'"  *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)).  The Court does "determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion."  *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)).

The SSA applies a five-step evaluation to determine whether the claimant is disabled.  *Stephens*, 888 F.3d at 327 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).  The ALJ must evaluate the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citations omitted).  "If a claimant satisfies steps one, two, and three, she will automatically be found disabled.  If a claimant satisfies steps one and two, but not three, then she must satisfy step four.  Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy."  *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe."  *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).  In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling."  *Id.*  The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and if not, at Step Five to determine whether the claimant can perform other work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits.  *Stephens*, 888 F.3d at 327.  When an ALJ's decision does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy.  *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021).  Typically, a remand is also appropriate when the decision is not supported by substantial evidence.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

## II.
### BACKGROUND

Amanda E. was 38 years old when her alleged disability began.  [*See* Filing No. 15-5 at 3.] She had completed some college and did not earn a degree but had earned a certified nursing assistant license.  [Filing No. 15-2 at 13.]  She had previously worked as a certified nursing assistant, patient care technician, security guard, hostess, and cook.  [Filing No. 15-6 at 18.][3]

The ALJ followed the five-step sequential evaluation set forth by the SSA in 20 C.F.R. § 404.1520(a)(4) and concluded that Amanda E. was not disabled.  [Filing No. 15-2 at 28-29.] Specifically, the ALJ found as follows:

- At Step One, Amanda E. had not engaged in substantial gainful activity[4] since August 22, 2019, the alleged onset date.  [Filing No. 15-2 at 21.]

- At Step Two, she had "the following severe impairments: external carotid artery dissection and conversion disorder with stuttering."  [Filing No. 15-2 at 21 (citation omitted).]

- At Step Three, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  [Filing No. 15-2 at 21.]

- After Step Three but before Step Four, Amanda E. had the RFC "to perform light work as defined in 20 CFR 404.1567(b) except she can effectively communicate simple information."  [Filing No. 15-2 at 22.]

- At Step Four, relying on the testimony of the vocational expert ("VE") and considering Amanda E.'s RFC, she was incapable of performing any of her past relevant work as a certified nursing assistant and cook.  [Filing No. 15-2 at 27.]

---

[3] The relevant evidence of record is amply set forth in the parties' briefs and need not be repeated here.  Specific facts relevant to the Court's disposition of this case are discussed below.

[4] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized).  20 C.F.R. § 404.1572(a).

- At Step Five, relying on the VE's testimony and considering Amanda E.'s age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that she could perform.  [Filing No. 15-2 at 28.]

### III.
### DISCUSSION

Amanda E. asserts a host of errors regarding the ALJ's decision.  She asks the Court to consider the following:

> Specifically, whether the: (1) Decision is premised on cherry-picked evidence and failed to provide an accurate and logical bridge to support the critical findings and conclusions; (2) ALJ erred in assessing Plaintiff's statements; (3) ALJ improperly substituted his lay opinion for those of the medical sources; (4) Step Three is flawed because Plaintiff's conditions meet Listing 12.07; (5) residual functional capacity (RFC) is unsupported given that it does not accommodate Plaintiff's conditions; and, (6) ultimate Decision is unsupported because the RFC did not account for *all* of Plaintiff's limitations and Vocational Expert (VE) testimony is required to assess the erosion of the occupational base given all of Plaintiff's limitations.

[Filing No. 14 at 1-2 (emphasis in original).]  The Court will address the arguments as necessary to resolve the appeal.

### A. Medical Opinion Evidence

Several of Amanda E.'s arguments involve the ALJ's discretion to credit the various medical assessments.  According to the new regulatory scheme for claims like Amanda E.'s that were filed on or after March 27, 2017, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),[5] including those from your medical sources." 20 C.F.R. § 404.1520c(a).  The SSA

---

[5] Administrative medical findings are determinations made by a state agency medical or psychological consultant at the initial or reconsideration stage about a claimant's case, "including, but not limited to, the existence and severity of [her] impairment(s), the existence and severity of [her] symptoms, whether [her] impairment(s) meets or medically equals the requirements for any impairment listed in appendix 1 to this subpart, and [her] residual functional capacity." 20 C.F.R. § 404.1513a(a)(1).

continues to use factors to evaluate the "persuasiveness of medical opinions and prior administrative medical findings" but the "most important factors" to be considered are "supportability" and "consistency." *Id.* How those factors were considered are to be explained in the decision. *Id.* at 404.1520c(b)(2). "Supportability" considers the relevance of "the objective medical evidence and supporting explanations presented by a medical source." *Id.* at 404.1520c(c)(1). "Consistency" is compared "with the evidence from other medical sources and nonmedical sources in the claim." *Id.* at 404.1520c(c)(2). Explicit consideration of the remaining factors is permitted, but not always required, except upon a finding that "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same . . . ." *Id.* at 404.1520c(b)(2)-(3). The remaining factors comprise such source's: (1) "[r]elationship with the claimant" including the "[l]ength of the treatment relationship," "[f]requency of examinations," "[p]urpose of the treatment relationship," "[e]xtent of the treatment relationship," and "[e]xamining relationship;" (2) "[s]pecialization;" and (3) "[o]ther factors," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements." *Id.* at 404.1520c(c)(3)-(5).

## 1. The ALJ's Reliance on the Prior Administrative Medical Findings

The ALJ found that the state agency reviewing medical experts' assessments were "persuasive" because they were "supported by the treatment records that show [that Amanda E. had] very few physical limitations and significant improvement in speech, but with an ongoing stutter." [Filing No. 15-2 at 26.] However, she contends that the ALJ substituted his lay opinion for the opinions of medical sources, [Filing No. 17 at 17], and the medical consultants' assessments were outdated and unsupported, [Filing No. 17 at 20-23].

6

The Seventh Circuit has explained that "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018) (citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (remanding where a later diagnostic report "changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment") (additional citation omitted)).  The Seventh Circuit has also "said repeatedly that an ALJ may not 'play[] doctor' and interpret 'new and potentially decisive medical evidence' without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ruling that the ALJ erred in failing to submit the claimant's first MRI in 11 years to medical scrutiny and in interpreting the results herself).

When Amanda A. applied for benefits, she alleged that her ability to work was limited by a blood clot, speech impairment, endometriosis, migraines, and history of a stroke.  [Filing No. 15-6 at 17.]  When the claim was last reviewed by the state agency consultants during the reconsideration phase, the medical consultant explained that Amanda E.'s allegation that she had a stroke was not supported by the medical evidence, but she had been diagnosed with a pseudoaneurysm[6] and atypical migraines that could explain her alleged impairments with speech and memory.  [Filing No. 15-3 at 22.]  The objective evidence that the consultant reviewed included a computed tomography angiography ("CTA") showing a mild pseudoaneurysm up to 8

---

[6] "A pseudoaneurysm, . . . [is] an injury to your blood vessel wall (usually an artery).  Blood pools in a small sac attached to one side of your artery.  Unlike an aneurysm, a pseudoaneurysm only includes one or two layers of your artery wall." Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/23250-pseudoaneurysm (last visited August 23, 2022).

mm in size, focal dissection of the distal left internal carotid artery[7] just below the skull base, no stenosis of blood flow, and subtle beading that favored a diagnosis of underlying fibromuscular dysplasia.  [Filing No. 15-3 at 24.]  The medical consultant assessed that Amanda E. was limited to lifting and carrying 20 pounds occasionally (1/3 or less of an eight-hour workday), 10 pounds frequently (more than 1/3 up to 2/3 of a workday), standing and walking for about six hours in an eight-hour workday, and sitting for about six hours in a workday.  [Filing No. 15-3 at 23.]  The ALJ's RFC finding that incorporated the regulatory definition of light exertional work[8] is consistent with the medical consultant's exertional assessments concerning Amanda E.'s abilities to lift, carry, stand, walk, and sit.

Crucially, there was no significant objective evidence that was submitted after the consultants' reconsideration reviews, including no diagnostic testing that required expert scrutiny.  [*See* Filing No. 15-2 at 33-34 (index of medical exhibits at the time of the ALJ's decision), *compared with* Filing No. 15-3 at 17-20 (sources of evidence received at the initial and

---

[7] "The carotid arteries are a pair of important blood vessels in your neck that supply blood to your brain.  An arterial dissection is when a tear in the layers of an arterial wall allows blood to flow between the layers of the artery.  [. . .]  A carotid artery dissection is when there's a tear in the arterial wall in your carotid arteries."  Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/22697-carotid-artery-dissection#management-and-treatment (last visited August 23, 2022).

[8] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 C.F.R. § 404.1567(b).  The SSA's guidance adds that "'[f]requent' means occurring from one-third to two-thirds of the time.  Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  Social Security Ruling ("SSR") 83-10 (S.S.A. 1983), 1983 WL 31251, at *6.

reconsideration stages, including "Good Samaritan Hospital" and "Good Samaritan Physician Services Internal Medicine" corresponding with Exhibits 9F and 10F respectively).] The evidence that Amanda E. contends needed medical scrutiny was either reviewed by the consultants, her own subjective reports, the functional assessment of her treating physician, or a diagnosis of conversion disorder. [*See* Filing No. 17 at 21-22.] For the reasons that follow, that evidence did not require further expert scrutiny or render the medical consultants' assessments stale.

## 2. Conversion Disorder

On January 30, 2020, neurologist Michael A. Hans, M.D., reviewed Amanda E.'s relevant medical file and examined her at the request of her primary care physician, John S. Pidgeon, M.D. [Filing No. 15-8 at 188-91.] Amanda E. presented with ongoing headache and stuttering symptoms and wanted a second opinion regarding a possible stroke that had occurred at work in late August 2019 and coincides with her alleged onset date. *Id*. While the episode was occurring, Amanda E. reported complete vision loss in both eyes, but her blindness improved after two days. [Filing No. 15-8 at 187-88.] Dr. Hans explained his assessment:

> After reviewing her MRI of her brain, she does not have evidence of stroke. I believe that her stuttering speech and her vision loss at that time represents a form of conversion disorder. I have recommended that she be referred to Dr. Courtney Johnson for cognitive behavioral therapy. She has a neuropsych appointment in April of this year for cognitive evaluation. Her CTA does appear that she may have a left carotid dissection, but I am awaiting the radiology reports for this. For the time being, I recommend that she continue taking a baby aspirin daily. With regard to her headaches, they are consistent with episodic migraines with aura. I recommend that she not take a triptan due to her aura. I will start her on amitriptyline 10 mg for 2 weeks and then increase to 20 mg daily for preventative and then, I will start her on naproxen 500 mg and Phenergan 12.5 mg to be taken at the time of onset of her headache for rescue therapy. I will plan to see the patient back in 3 months or sooner should questions or concerns arise.

[Filing No. 15-8 at 190.] After a follow-up on May 15, 2020, Dr. Hans explained:

> I was able to obtain the records from her outside hospital which did confirm a left carotid focal dissection with pseudoaneurysm. MRI of her brain was negative for

stroke.  I do not believe that her focal carotid dissections on the left is the etiology of her symptoms as anatomically does not correlate.  Additionally her MRI shows no stroke and she continues to have persistent issues of left-sided weakness and stuttering speech, which is consistent with a psychogenic etiology.  She has an appointment scheduled with her neuropsychologist.

[Filing No. 15-8 at 193.]  After excluding an organic etiology of some of Amanda E.'s symptoms, Dr. Hans diagnosed conversion disorder.  [Filing No. 15-8 at 192.]

In *Sims v. Barnhart*, 442 F.3d 536, 537-38 (7th Cir. 2006), the court discussed a "somatoform disorder" like "conversion disorder," and the "difficult proof issues" that are implicated by such a diagnosis.  The court explained that "[t]he problem of proof arises when the symptoms are reported by the claimant but not verified by medical experts."  *Id*. at 537.  Because "if a claimant's symptoms are severe enough to be disabling, the fact that they have no organic cause is irrelevant."  *Id*. at 538.  Amanda E. contends that Dr. Hans's conversion disorder diagnosis required further expert review.  The Commissioner agrees that the relevant evidence concerning the diagnosis itself was submitted after the last consultant review.  [Filing No. 18 at 17-18.]

During reconsideration, a psychological consultant reviewed the record for evidence of a neurocognitive disorder based on Amanda E.'s reported memory problems.  [Filing No. 15-3 at 34.]  The consultant explained that Amanda E. reported sufficient memory capabilities to complete chores around the house, shop for groceries with the assistance of her husband and a list, take care of her dog, cook without problems, attend her scheduled appointments, and walk to her grandma's house eight houses down to visit and back without issue.  *Id*.  The consultant also explained that he found no evidence of a relevant medically determinable impairment.  *Id*.  To be medically determinable, an "impairment(s) must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1521.  The SSA's guidance explains that "[a]n individual's

symptoms, . . . will not be found to affect the ability to perform work-related activities for an adult . . . unless medical signs or laboratory findings show a medically determinable impairment is present." SSR 16-3p (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *3. At first blush, Dr. Hans's conversion disorder diagnosis appears to have filled a critical gap in the record by supplying the medically determinable impairment that would require the consideration of Amanda E.'s relevant symptoms.

Amanda E.'s arguments imply that the ALJ erred by failing to submit the updated record to further review to assess mental limitations corresponding with her conversion disorder. She contends that the ALJ erred at Step Three by ignoring evidence of relevant limitations, [Filing No. 17 at 23-26], and when evaluating her RFC by not assessing appropriate mental limitations, including with her abilities to remain on task and deal with stress in the workplace, [Filing No. 17 at 30-32]. However, a claimant has the burden to provide evidence of not only a medically determinable impairment, but of specific limitations affecting her capacity to work. *See, e.g.*, *Schmidt v. Barnhart*, 395 F.3d 737, 745-46 (7th Cir. 2005). Regarding the claimant's burden to produce evidence, the Seventh Circuit has held that "[w]hen an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making [her] strongest case for benefits."[9] *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987); *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017). In *Sims*, the claimant had produced evidence of vision testing showing that she had tunnel vision, which can be caused by an organic etiology or conversion disorder. 442 F.3d at 538 (citations omitted). The court noted that the claimant had not produced evidence fleshing out the etiology of her demonstrated symptom. *Id*. at 538-39. The court also explained that "the symptoms of

---

[9] Amanda E. was represented by counsel at the administrative hearing. [Filing No. 15-2 at 36.]

conversion disorder are often precipitated by stress and a psychiatric examination might determine

whether the claimant was experiencing or had recently experienced stress." *Id.* at 539 (citations

omitted).  The court held because of the claimant's "failure to produce evidence beyond the results

of the vision tests, the administrative law judge was entitled to reject her claim to be totally disabled

as a consequence of somatoform disorder." *Id.*

> Here, the ALJ explained that:
>
> On June 9, 2020, Christopher Stewart, M.D., noted that a neurobehavioral status
> exam was indicated.  [Amanda E.] reported that at the time of her episode in August
> 2019, she had slow processing speed and forgetfulness cognitively and she reported
> difficulty executing overlearned tasks.  She reported that she did not feel capable
> of performing her work duties currently due to her cognitive symptoms and she
> stopped driving voluntarily due to her concern about slow processing speed.
> Although it was noted that a neurobehavioral status exam was performed by Dr.
> Stewart, there is no examination results in the record.

[Filing No. 15-2 at 25-26 (citation omitted).]  The ALJ cited to a letter written in June 2020 to Drs.

Pidgeon and Hans by Dr. Stewart that indicated he had spent an hour conducting and interpreting

results from a neurobehavioral status examination "including clinical assessment of thinking,

reasoning, and judgment (e.g., acquired knowledge, attention, language, memory, planning and

problem solving, and visual spatial abilities) . . . ."  [Filing No. 15-8 at 194-95.]  Dr. Stewart

explained that Amanda E.'s "psychiatric history [was] noteworthy for physical abuse and neglect

during childhood."  [Filing No. 15-8 at 194.]  He also explained that "[a] comprehensive

neuropsychological evaluation [was] indicated in light of the information detailed above.  This

will assist in defining her broader cognitive functioning in greater detail, elucidating the

depth/breadth of any current impairment, and teasing apart psychiatric and neurologic

contributions to her current presentation."  [Filing No. 15-8 at 194-95.]  But Dr. Stewart's letter

did not even summarize the results of his initial clinical examination.  On August 5, 2020, Dr.

Pidgeon noted that Amanda E. reported that she had seen "a neuropsychologist for memory loss

workup yesterday and states she was told that he felt her symptoms were due to prior emotional trauma." [Filing No. 15-8 at 267.] But that workup and testing was also not produced.

Notably, the ALJ found that Amanda E.'s conversion disorder was a severe medically determinable impairment. The ALJ evaluated Listing 12.07 for "somatic symptom and related disorders," but found no more than mild limitations when he assessed the paragraph B criteria, which does not satisfy the required severity of the listing to establish presumptive disability. [Filing No. 15-2 at 22]; 20 C.F.R. § Pt. 404, Subpt. P., App. 1, 12.07. The record that the ALJ evaluated did not include any specialized treatment for Amanda E.'s mental impairments or clinical findings from mental status examinations to demonstrate the nature and severity of her limitations. There was also no standardized objective testing, *i.e.* to evaluate her alleged memory problems, other than testing performed by a speech-language pathologist to evaluate her stuttering. Absent the results of Dr. Stewart's testing or some comparable evidence, there was no relevant evidence to undermine the ALJ's material findings concerning Amanda E.'s mental impairments, nor is there any basis to conclude that further expert scrutiny was necessary.

### 2. Stuttering

Consistent with Dr. Hans's assessment that Amanda E.'s stuttering was a symptom of conversion disorder, the ALJ explicitly found that she had "conversion disorder with stuttering." [Filing No. 15-2 at 21.] Based on the adequate development of that symptom in the record, the ALJ assessed that Amanda E. was limited to effectively communicating only simple information. The SSA's guidance explains that "[b]asic communication is all that is needed to do unskilled work. The ability to hear and understand simple oral instructions or to communicate simple information is sufficient. If the individual retains these basic communication abilities, the unskilled sedentary occupational base would not be significantly eroded in these areas." SSR 96-

9p (S.S.A. July 2, 1996), 1996 WL 374185, at *8.  Relying on that guidance, the ALJ found that Amanda E.'s communicative limitation did not significantly erode the occupational base of unskilled work.  [Filing No. 15-2 at 28.]  He also concluded that according to the Medical-Vocational Guidelines a finding of "not disabled" was directed based on Amanda E.'s age, education, work experience, and her ability to effectively perform the full range of light exertional work.  *Id*.; *see* 20 C.F.R. § Pt. 404, Subpt. P., App. 2, Rule 201.28 (for an individual limited to sedentary exertional work) and Rule 202.21 (limited to light exertional work); *see also* 20 C.F.R. § 404.1567(b) ("If someone can do light work, [the SSA] determine[s] that . . . she can also do sedentary work, unless there are additional limiting factors such as loss of dexterity or inability to sit for long periods of time.").

Amanda E. contends that the ALJ did not adequately evaluate her stuttering according to SSR 82-57 for "functional efficiency."  [Filing No. 17 at 29.]  The ruling explains:

> Ordinarily, when an individual's impairment prevents effective speech, the loss of function is sufficiently severe so that an allowance under Listing 2.09 is justified on the basis of medical considerations alone, unless such a finding is rebutted by work activity.  To speak effectively, an individual must be able to produce speech that can be heard, understood, and sustained well enough to permit useful communication in social and vocational settings.
> [. . .]
> Three attributes of speech pertinent to the evaluation of speech proficiency are: (1) audibility—the ability to speak at a level sufficient to be heard; (2) intelligibility—the ability to articulate and to link the phonetic units of speech with sufficient accuracy to be understood; and (3) functional efficiency—the ability to produce and sustain a serviceably fast rate of speech output over a useful period of time. When at least *one* of these attributes is missing, overall speech function is not considered effective.

SSR 82-57 (S.S.A. 1982), 1982 WL 31382, at *1 (emphasis in original).  The guidance further explains that "*[t]he rate of speech and the degree of ease with which the individual's speech flows (functional efficiency)* . . . [is] how long . . . she is able to sustain consecutive speech; the number

of words spoken without interruption or hesitancy; whether . . . she appears fatigued, and if so, after how long." *Id*. at *2.

During the initial phase, a consultant speech-language pathologist reviewed the relevant evidence, including a consultative examiner's finding that despite Amanda E. having a significant stutter, her speech was fluent, comprehension was intact, and these was no evidence of true aphasia.[10]   The pathologist concluded that Amanda E.'s "[l]anguage [was] functional and speech, though dysfluent, [was] not ineffective.   Therefore, [her] speech [impairment was] not severe." [Filing No. 15-3 at 6.]   During reconsideration, the record included virtually all the relevant evidence of Amanda E.'s treatment with a speech-language pathologist.   The ALJ summarized the evidence and explained his conclusion:

> Outpatient speech therapy progress notes indicate that the claimant met one out of three targeted goals with some increases in moments of stuttering noted on November 1, 2019. On January 7, 2020, the speech therapist noted that the claimant continued to do very well with use of strategies to decrease stuttering and reading, but with less consistent use noted in conversational tasks.   Her symptom severity was noted to be very mild at that time.   She made significant gains in both reading and monologue tasks, and percentage of syllables stuttered had decreased.   Her therapy was put on hold to determine if she was able to maintain good performance independently with reassessment scheduled in one month.   This evidence supports finding that the claimant can communicate simple information and does not support the claimant's subjective reports that her speech prevents her from working.

[Filing No. 15-2 at 25.]   During treatment for her stutter, Amanda E.'s testing performance was variable, and her progress was not linear.   But when she was evaluated on January 7, 2020, her percentile on the stuttering severity instrument had improved from between the 61st and 77th when she started treatment to between the 5th and 11th indicating "very mild" impairment.   [Filing No. 15-8 at 179.]   At the reconsideration stage, the reviewing medical consultant assessed that Amanda

---

[10] "Aphasia is a brain disorder where a person has trouble speaking or understanding other people speaking."   Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/5502-aphasia (last visited August 24, 2022).

E. had "a significant stutter that impacts her communication speed, but she is able to effectively communicate." [Filing No. 15-3 at 23-24.]   On February 4, 2020, during the only relevant evaluation that was submitted after the reconsideration review, Amanda E. did not quite meet her goal of less than 25% of stuttering syllables in conversational speaking tasks; her stuttering syllables were 28%. [Filing No. 15-8 at 241.]   However, she was discharged from treatment and her provider explained:

> She has demonstrated her ability to maintain performance with her speech, and demonstrates increasing confidence with her speech.   Husband reports she continues to talk quickly when excited; however, is able to slow her rate of speech when cued to increase her overall intelligibility.   At this time, speech appears to be stable.   She does know and utilize several strategies to assist with her speech when moments of stuttering are high.

*Id*.   The evidence shows that even with improvement during treatment, Amanda E. had some functional efficiency deficits.   She continued to stutter particularly when excited and needed to slow down her speech to communicate clearly.   Despite the deficits, the consultants concluded that her speech remained "effective," and there is no contrary opinion indicating that her functional efficiency deficits were severe enough to preclude effective communication.   By implication, if the consultants deemed her speech effective, it seems reasonable to conclude that she retained the ability to communicate effectively enough to meet the reduced communication demands of unskilled work.   Or at least, Amanda E. has not demonstrated that the ALJ's assessment that she was limited to communicating simple information was insufficient to account for her deficit with how quickly she could speak.

### 4. Consultative Examiner's Opinion

Amanda E. contends that the ALJ erred by rejecting the opinion of Bart J. Goldman, M.D. [Filing No. 17 at 18.]   She also contends that Dr. Goldman's opinion supports a disability finding. *Id*.   On December 12, 2019, Amanda E. attended a consultative examination at the request of the

16

Disability Determination Bureau that was performed by Dr. Goldman.  [Filing No. 15-8 at 155-57.]  Dr. Goldman's findings included that Amanda E. had a normal gait without an assistive device but was unable to ambulate heel-to-toe without stumbling to either side, she had normal 5/5 strength in all muscle groups except slightly decreased "4++/5" strength in left upper and lower extremity, normal reflexes, normal sensation in her right upper and lower extremity, "minimally decreased sensation throughout the entirety of the left upper and left lower extremity," "4+/5" grip strength in her left hand, "[s]he was able to easily touch her ulnar 4 fingers with tips of her thumb bilaterally," and she could pick up a coin, button and unbutton, and "easily" grasp a pen with either hand.  [Filing No. 15-8 at 158.]  Dr. Goldman assessed that despite a "history of a stroke," there was "nothing on examination at th[at] time which would [have] prevent[ed] th[e] claimant from ambulating 4 hours out of an 8 hour day, carrying less than 10 pounds frequently and/or carrying more than 10 pounds on an occasional basis."[11]  [Filing No. 15-8 at 159.]

The ALJ found that Dr. Goldman's opinion was "not persuasive" because it was "vague," indicated "the least" the claimant could do and was not "fully consistent" with the reviewing consultants' opinions or the weight of the evidence showing mild or normal findings on more recent examinations.  [Filing No. 15-2 at 26-27.]  But the ALJ's rejection of Dr. Goldman's opinion is immaterial.  As discussed above in the preceding section of this entry, the ALJ concluded at Step Five that the Medical-Vocational Guidelines directed a finding of non-disability if Amanda E. were further limited to effectively the full range of sedentary exertional work.  By definition:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

---

[11] Amanda E. testified that she was limited to lifting and carrying ten pounds.  [Filing No. 15-2 at 55.]

20 C.F.R. § 404.1567(a).  The SSA's guidance adds:

> "Occasionally" means occurring from very little up to one-third of the time.  Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday.

SSR 83-10, 1983 WL 31251, at *5.  Dr. Goldman's opinion is consistent with the demands of sedentary exertional work.  Accordingly, Amanda E. was not prejudiced by the ALJ's rejection of Dr. Goldman's opinion.

### 5. Dr. Pidgeon's Opinion

Amanda E. also contends that the ALJ erred by rejecting Dr. Pidgeon's opinion.  [Filing No. 17 at 20.]  On September 24, 2019, Dr Pidgeon's assessment included that Amanda E. could sit or stand for 45 minutes at a time each, sit at least six hours in an eight-hour workday, stand and walk for at least two hours in a workday, occasionally lift and carry ten pounds, occasionally climb, balance, stoop, kneel, crouch, and crawl, but she would have likely been off task 25% or more of the workday.  [Filing No. 15-8 at 151-54.]  Dr. Pidgeon explained that his assessment was supported by stuttering observed during examination, a 17-year history of headaches that he indicated was a subjective complaint, and a left carotid dissection demonstrated by CTA.  [Filing No. 15-8 at 154.]  The final question on the form asked if the assessed limitations had "lasted or will they last 12 consecutive months?"  Id.  Dr. Pidgeon circled no and handwrote to explain that he would "reassess" in four months based on her response to ongoing treatment including speech therapy.  Id.

The ALJ found Dr. Pidgeon's opinion unpersuasive "because her limitations were not expected to last 12 months.  Additionally, recent treatment notes show normal to very mild findings on physical examination."  [Filing No. 15-2 at 27 (citations omitted).]  The Social Security Act's

18

definition of disability includes a durational requirement that claimant's inability to work must be "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423.   An ALJ is "entitled to limit [an assessment] to its proper context," if the "short-term" assessment "does not translate into a long-term need." *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018).   Additionally, as explained above, the new regulatory scheme for evaluating medical opinions does not give any special deference to the source of an opinion; a treating relationship is only a secondary factor.   According to the now rescinded treating physician rule, the Seventh Circuit had explained that "[m]ore weight is given to the opinion of a treating physician because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citation omitted); *see* 20 C.F.R. § 404.1527(c)(2)(i)-(ii) (regarding the older regulatory scheme for evaluating opinions). However, even under the older scheme, the Seventh Circuit had explained that it "would be exceedingly illogical to credit a doctor's opinion because he is *more likely* to have a detailed and longitudinal view of the claimant's impairments when *in fact, there is no detail*[ed] *or longitudinal view*." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (emphasis in original).   Here, Dr. Pidgeon had a limited treatment relationship with Amanda E. at the time of his assessment.   He explained that his treating relationship had begun in February 2019.   [Filing No. 15-8 at 151.] Based on his express representations that her limitations were not expected to meet the durational requirement and he would need to reassess after further treatment, the ALJ was entitled to limit Dr. Pidgeon's opinion to its temporary context.

Amanda E. asserts that "there is *no evidence* that Dr. Pidgeon *rescinded* or otherwise modified his original opinion." [Filing No. 17 at 20.]   But her argument is belied by the record.

On August 5, 2020, after further evaluation, Dr. Pidgeon assessed "probable" conversion disorder. [Filing No. 15-8 at 267.]  He explained:

> I am concerned that many of the patient's symptoms are psychogenic, and that her left carotid dissection is a chronic and incidental finding.  Her previous left arm and left leg weakness/numbness complaints did not correspond anatomically with the left carotid system.  Also, no stroke has been seen on multiple brain MRI[s], as per radiology report.  The fact that she was developing new unusual neurological symptoms over time despite stable/unremarkable neuroimaging was also concerning for an underlying functional etiology.  In regards to the patient's request for physician assessment for disabilty [sic], I referred her to occupational medicine for a functional capacity assessment.

*Id*.  Based on the benefit of a more longitudinal treating relationship, Dr. Pidgeon was not willing to support Amanda E.'s disability claim.  At least, he was unwilling to commit to an opinion without further evaluation.  Accordingly, the ALJ did not error by rejecting Dr. Pidgeon's opinion.

### B. Subjective Symptom Evaluation

Amanda E. contends that two critical defects infect the ALJ's entire decision: that he cherrypicked the evidence and failed to build an accurate and logical bridge from the evidence to his conclusions.  [Filing No. 17 at 11.]  She further contends that these errors are most apparent in the ALJ's subjective symptom evaluation.  [Filing No. 17 at 12.]  Specifically, her arguments include that the ALJ overstated her improvement during speech therapy and did not recognize that her variable performance was related to her levels of stress and headache pain, his assertion that she "did not complain to her providers about left-arm weakness is belied by the record," and there was no evidence that her headaches were "relieved" by over-the-counter medications.  [Filing No. 17 at 15-17.]

When evaluating a claimant's subjective statements about the intensity and persistence of his symptoms, the ALJ must often, as here, make a credibility determination concerning the limiting effects of those symptoms.  *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016).  Reviewing

courts "may disturb the ALJ's credibility finding only if it is 'patently wrong.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015)).   Reviewing courts examine whether a credibility determination was reasoned and supported; only when an ALJ's decision "lacks any explanation or support . . . will [a court] declare it to be 'patently wrong.'" *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).  If a fully favorable determination cannot be made based solely on the objective medical evidence, SSR 16-3p directs the ALJ to consider "all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms . . . ."  SSR 16-3p, 2017 WL 5180304, at *6-8.  This includes the regulatory factors relevant to a claimant's symptoms, like daily activities, the location, duration, frequency, and intensity of pain or other symptoms, factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; and treatment, other than medication, an individual receives or has received for relief of pain or other symptoms.  *Id.* at *7-8; 20 C.F.R. § 404.1529(c)(3).  The ALJ should also consider any inconsistencies with the evidence, including conflicting statements made by the claimant and others such as treating sources.  20 C.F.R. § 404.1529(c)(4).

The ALJ found that Amanda E.'s "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e] decision." [Filing No. 15-2 at 24.] The ALJ explained the subjective statements that he found supported and he gave several reasons for discrediting other alleged limitations.  For example, the ALJ explained that "an extensive work-up showed normal or mildly decreased strength of the left extremities that support the claimant's subjective limitation in lifting.  Additionally, speech therapy records indicate some stuttering that

supports the claimant's limitations in speech, but the record overall shows improvement and an ability to communicate simple information."  [Filing No. 15-2 at 26.]  He also explained:

> The claimant testified at the hearing that she could not lift her left arm, but there were no complaints to treating medical care providers or findings in the record to support this.  She also testified that she was frequently limited by migraine headaches, but she worked with headaches in the past and her headaches were relieved with other-the-counter medication.

*Id*.

Contrary to Amanda E.'s contention, the ALJ did not state that her complaints of left arm weakness were unsupported by the record.  He expressly credited her subjective reports that she was limited lifting weight despite limited objective support that did show some decreased strength in her left arm.  During the hearing Amanda E. testified that she had "problems with lifting stuff." [Filing No. 15-2 at 50.]  But she also testified that she could not "seem to raise [her left] arm past like right, right where [her] hip . . . is."  *Id*.  The ALJ may consider inconsistencies between the severity of symptoms that Amanda E. described during her disability claim compared with when she was seeking treatment. *See e.g.*, *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005). Even from a purely subjective standpoint, there is no evidence that she could not raise her left arm above her hip.  For example, when she was examined during a neurosurgical consultation, she was "moving both upper extremities equally and symmetrically."  [Filing No. 15-8 at 254.]  Amanda E.'s representation during the hearing supports the ALJ finding that her statements were not entirely credible.

Regarding Amanda E.'s migraine symptoms, the ALJ's evaluation is not entirely accurate, but also not as one-sided as she contends.  The demonstrated ability to work with an impairment or impairments—absent evidence showing the impairments have worsened—is substantial evidence supporting an ALJ's conclusion that "long-standing complaints" did not render the

claimant disabled. *Castile v. Astrue*, 617 F.3d 923, 927-28 (7th Cir. 2010). Amanda E. reported that she had suffered from migraines for approximately 17 years before her alleged onset date, including when she demonstrated the capacity to earn substantial gainful activity. She has not specifically asserted that her migraines have worsened since she was last working. The ALJ's rationale that Amanda E. has demonstrated her ability to work with migraines in the past is a valid consideration.

On the contrary, there does not appear to be any support for the ALJ's assertion that Amanda E.'s migraines were "relieved" by over-the-counter medication. When she started treatment with Dr. Hans, she reported having migraines about one to two times a week with associated sensitivity to light and sound, nausea, and an aura. [Filing No. 15-8 at 189.] She reported that she generally preferred to lie down in a dark room when she had a migraine. *Id*. She denied taking any over-the-counter medication at the time or having ever tried a "preventative medication." *Id*. At a follow-up, she denied any improvement with an amitriptyline prescription, she was still having one to two migraines per week, and she had developed a side effect from the medication. [Filing No. 15-8 at 192.] When the ALJ summarized her treatment, he acknowledged that "she reported no improvement in her migraine headaches with the medication." [Filing No. 15-2 at 25.]

During the hearing, Amanda E. testified that she had started taking Excedrin Migraine after stopping the amitriptyline, but her providers were not doing anything else for her, and she was not getting treatment for her stress-related symptoms. [Filing No. 15-2 at 51.] Although she testified that she was still getting migraines two to three times a week, had one every day the past week, and the prior Thursday she had a "bad one." [Filing No. 15-2 at 56.] Perhaps the ALJ extrapolated

that because she was taking only an over-the-counter medication as opposed to some prescription medication that she was getting relief.  But that is not well supported by the record.

Amanda E. also contends that her speech therapy treatment demonstrates that her headaches were functionally limiting because her stuttering increased when she reported having a headache.  Her provided did track her reported headache pain levels along with her performance on speech tasks.  But the evidence does not necessarily demonstrate functional impairment associated with her subjective symptoms.  For instance, on October 24, 2019, Amanda E. "reported current headache at a 7/10, right sided," and she still "met 4/4 goals" on that date.  [Filing No. 15-8 at 218.]  The treatment evidence that she contends was ignored by the ALJ does not clearly support that she would be off task or incapable of communicating effectively, much less confined to lying in a dark room.  Taken together, Amanda E. has not demonstrated that the ALJ's credibility determination was patently wrong.

## IV.
### CONCLUSION

The Court concludes that the ALJ applied the correct legal standards and that the record contains substantial evidence for the ALJ's decision.  As there is no legal basis to reverse the ALJ's decision that the Plaintiff was not disabled during the relevant period, the decision below is **AFFIRMED**.  Final judgment will issue accordingly.

**SO ORDERED.**

Date: 9/23/2022

Mario Garcia
United States Magistrate Judge
Southern District of Indiana

Distribution:

All Electronically Registered Counsel